# In the United States Court of Federal Claims

## BID PROTEST

|  |  |  |
|---|---|---|
| TEKSYNAP CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | No. 23-36C |
| Defendant, | ) | (Filed Under Seal: August 18, 2023) |
| and | ) | (Reissued: August 30, 2023) |
| CHENEGA AGILE REAL-TIME SOLUTIONS, LLC, | ) | |
| Defendant-Intervenor. | ) | |

Elizabeth N. Jochum, Blank Rome LLP, Washington, DC, for Plaintiff, with whom was David L. Bodner, Blank Rome LLP, Of Counsel.

Domenique Kirchner, Trial Attorney, with whom were Douglas K. Mickle, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for Defendant. Bree Ermentrout, Assistant General Counsel, Acquisition and Intellectual Property Division, Office of the General Counsel, National Geospatial-Intelligence Agency, Of Counsel.

William K. Walker, Walker Reausaw, Washington, DC, for Defendant-Intervenor, with whom was Kenneth A. Martin, Martin Law Firm, McLean, VA, Of Counsel.

**OPINION AND ORDER**[*]

**KAPLAN, Chief Judge.**

In this post-award bid protest, Plaintiff, TekSynap Corporation ("TekSynap"), challenges the decision of the National Geospatial-Intelligence Agency ("NGA" or "the Agency") to award intervenor, Chenega Agile Real-Time Solutions, LLC ("CARS"), an Enterprise Management Services ("EMS") indefinite-delivery, indefinite-quantity ("IDIQ") contract. TekSynap contends that the contract award should be set aside because: (1) CARS's successful proposal included material misrepresentations concerning an individual it identified to serve in one of the contract's key personnel positions; (2) the Agency's price realism analysis was flawed; and (3) the discussions the Agency held with TekSynap before it submitted its final proposal revisions were misleading and unequal.

Currently before the Court are TekSynap's third motion to supplement the administrative record, ECF No. 68, and the parties' cross-motions for judgment on the administrative record, see Pl.'s Mot. for J. on the Admin. R. [hereinafter "Pl.'s MJAR"], ECF No. 27; Intervenor's Cross-Mot. For J. on the Admin. R. [hereinafter "Int.'s MJAR"], ECF No. 35; Def.'s Cross-Mot. for J. on the Admin. R. [hereinafter "Def.'s MJAR"], ECF No. 37.

For the reasons set forth below, TekSynap's third motion to supplement the administrative record, ECF No. 68, is **GRANTED**, TekSynap's motion for judgment on the administrative record, ECF No. 27, is **DENIED**, and the cross-MJARs of the government and of CARS, ECF Nos. 35 and 37, are **GRANTED**.

## BACKGROUND

### I.     The Solicitation

On March 9, 2020, NGA issued Request for Proposal No. HM0476-20-R-0001 ("RFP" or "the Solicitation"). Admin. R. ("AR") Tab 13a at 611.[1] The RFP, which was set aside for small businesses only, AR Tab 14 at 933, sought proposals to provide NGA with a broad range of information technology services for government networks and security domains, including intelligence community cloud environments at multiple locations, AR Tab 13a.

The EMS contract would be an IDIQ vehicle with an eight-year ordering period. AR Tab 120.1 at 16831–32. The initial task order ("Task Order 1"), which would be issued

---

[*] This Opinion was originally filed under seal on August 18, 2023. ECF No. 87. The parties were given ten days to propose redactions. Id. at 22. On August 28, 2023, the government filed a motion to redact the non-party third offeror's name from the Opinion. The Court granted the motion by order of August 30, 2023, and this reissued Opinion includes the redactions requested. See Order, ECF No. 92.

[1] The administrative record in this case was filed in DVD/CD-form and does not have its own docket number. See Def.'s Notice of Filing the Admin. R., ECF No. 20.

simultaneously with the contract award, would have a one-year base performance period and seven one-year option periods. Id.

The RFP specified that proposals would be evaluated on the basis of four factors. These were, in descending order of importance: (1) Technical/Management; (2) Past Performance; (3) Security; and (4) Price. Id. at 16857. The award decision would be based on a best-value tradeoff under which non-price evaluation factors, when combined, would be treated as "significantly more important" than price. Id. at 16857, 16859. Two of the four factors are relevant to the resolution of the issues raised in this protest: technical/management and price.

### A.     Evaluation of the Technical/Management Factor

The most important factor under the RFP was the technical/management factor. Id. at 16859. It consisted of three subfactors: Management Plan, Technical Approach, and Transition Plan. Id. at 16858–59. Out of these, management plan was "slightly more important than the other subfactors." Id. at 16859. Consideration of the management plan would involve an assessment of an offeror's "Management Approach, Staffing Plan, Key Personnel, and Mission Essential Contractor Services Plan." Id. at 16861.

The key personnel component of the management plan subfactor is relevant to the material misrepresentation claim raised in this protest. The RFP identified three key personnel positions: program manager, chief engineer, and operations manager. Id. at 16847. Offerors were required to submit resumes and Letters of Commitment for each of their proposed key personnel. Id. The Letters were to be "addressed to the CO and signed by the respective individual being proposed for the Key Personnel positions." Id. Those Letters were to "clearly and affirmatively state the named individual's commitment to perform without reservation the duties and responsibilities specified in the offeror's proposal for the key position." Id.

The RFP provided that the Agency would evaluate the resumes of proposed key personnel to determine "the extent to which the offeror demonstrates they have the qualifications to perform in the role in accordance with requirements in [the] IDIQ [Performance Work Statement]." Id. at 16861. The RFP further provided that when evaluating key personnel, "[i]ndividual commitments to dedicate time 100% to the EMS contract and commit to more than 12 months of performance from contract award will be weighted more heavily than individuals who commit to only 12 months of performance." Id.

Under the RFP, color-coded adjectival ratings would be assigned to the proposal for each subfactor within the technical/management factor. These ratings were, from highest to lowest: Outstanding (Blue), Good (Purple), Acceptable (Green), Marginal (Yellow), and Unacceptable (Red). Id. at 16859–60.

An Outstanding rating would be assigned where a proposal "indicate[d] an exceptional approach and understanding of the requirements," "contain[ed] multiple strengths," and where the "risk of unsuccessful performance" was "low." Id. at 16859. By contrast, a Marginal rating would be assigned where the proposal did not demonstrate "an adequate approach and understanding of the [RFP] requirement and/or [the] risk of unsuccessful performance is high." Id. And an Unacceptable rating would be assigned where a proposal did not meet solicitation

requirements, "and, thus contains one or more deficiencies and/or risk of unsuccessful performance is unacceptable." Id. at 16860.

The RFP also included criteria for determining the level of risk to successful performance presented by the proposal based on the number and types of weaknesses, if any, that the Agency identified. Id. It further included definitions and degrees of strengths, weaknesses, and deficiencies that might be identified during the evaluation of a proposal. Id. at 16860–61.

A "low risk" would be assigned where a proposal contained a weakness (or weaknesses) "which have little potential to cause disruption of schedule, increased cost or degradation of performance," and where "[n]ormal contractor effort and normal Government monitoring will likely be able to overcome any difficulties." Id. at 16860. On the other end of the spectrum, a proposal would be considered "high risk" if it contained "a significant weakness or combination of weaknesses which [are] likely to cause significant disruption of schedule, increased cost or degradation of performance," and where the contractor is "unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring." Id.

The RFP provided that the adjectival and risk ratings assigned for each subfactor "will be weighted based on the order of importance of all the subfactors." Id. at 16859. Those ratings would "then [be] rolled up to determine an overall rating for the Technical/Management Factor." Id.

### B.     Price Realism Analysis

The RFP specified that offerors' prices would be evaluated for completeness and reasonableness. Id. at 16867. It also provided that "the Government may conduct [a] price realism analysis" on fully burdened labor rates (hereinafter "labor rates" or "FBLRs"), the Service Catalog Price List (hereinafter "SCP List"), and/or the Task Order 1 price proposal. Id.

RFP Section L.25.6.2 required offerors to provide FBLRs for ten labor categories for the entire eight-year ordering period. AR Tab 5a at 323. Within the labor categories FBLRs were to be provided for a total of 240 labor category mixes. AR Tab 13b6. The labor category mixes consisted of groupings of positions coupled with specified factors, including education and years of relevant experience. AR Tab 13b5. The relevant factors also included skill level, the extent to which positions involved individual effort, teamwork or leadership, and the amount of supervision required. Rates were also dependent on the security clearance needed for each position and whether the job could be performed on site or off site. AR Tab 5b6; AR Tab 13b6 at 840 (noting that price adjustments would be made to FBLRs based on site type, location, and clearance).

The SCP List contained the prices for thirty-eight different Service Catalog IDs ("SCIDs") the government anticipates ordering in subsequent task orders. There are 2,112

Service Catalog prices for the SCIDs, "with various price variables for Service Support Levels, Locations, Site Types, and Clearance Levels." AR Tab 147c at 20814.[2]

The RFP stated that the purpose of conducting a price realism analysis was to "assess the risk of performance due to unrealistically low prices." AR Tab 120.1 at 16867. A price realism analysis of labor rates, for example, would allow the Agency "to assess whether an offeror's unrealistically low labor rates reflect a lack of technical understanding or risk." Id. "If conducted," the RFP stated, "any risk identified during the price realism analysis will also impact the evaluation rating under the Technical/Management Factor." Id.

## II. Initial Contract Award and Government Accountability Office Protest

Five offerors submitted proposals in response to the Solicitation. After the proposals were evaluated and ratings assigned, NGA established a competitive range that included the proposals submitted by TekSynap, CARS, and the third offeror. AR Tab 41 at 6235. Discussions were held, final proposal revisions ("FPRs") were submitted, and—based on a best-value tradeoff— NGA awarded the EMS Contract to CARS in November 2020. AR Tab 53a1 G.1.

On December 9, 2020, TekSynap protested the award to the Government Accountability Office ("GAO"). AR Tabs 47–48; see also Matter of TekSynap Corp., B- 419464, 2021 WL 1425296 (Mar. 19, 2021). GAO sustained several of TekSynap's protest grounds. It recommended that NGA either "reevaluate proposals in a manner consistent with the terms of the solicitation and this decision" or that it "reopen discussions and request revised proposals before reevaluating, and make a new source selection decision based on that reevaluation." Matter of TekSynap Corp., 2021 WL 1425296, at *12.

## III. NGA's Corrective Action After the GAO Decision

After GAO issued its decision, NGA undertook corrective action. It ultimately decided to amend the RFP in several respects. It also secured a second round of FPRs from the four offerors in the competitive range, AR Tab 68 at 9893, submitted on June 30, 2021, AR Tab 87 at 13241. The Agency appointed a new Technical/Management Evaluation Team ("TMET" or "technical team"), a new Security Evaluation Team, and a new Price Evaluation Team ("PET" or "price team") to evaluate the second set of FPRs. AR Tab 87 at 13242.

Based on the results of that evaluation of the second set of FPRs, the Agency elected to establish a new competitive range and open discussions. The new competitive range consisted of CARS, TekSynap, and the third offeror. Id. at 13263–64. After multiple rounds of conversations with the three offerors, NGA closed discussions on March 7, 2022, and requested that they submit a third set of FPRs on March 21, 2022. AR Tab 108c1 at 14175.

---

[2] According to the government, "[a] Service Catalog ID . . . is a block of service, involving labor hours and the personnel-types performing them to accomplish the specified task." Def.'s Reply at 21 (citing AR Tab 13b3 at 797–823). The RFP provided that the offeror was to base its proposed prices on the labor categories and skill levels in the labor category tables and its proposed fully burdened labor rates. AR Tab 120.1 at 16854.

All three offerors submitted proposals, which the Agency evaluated. It then entered into another round of written discussions with the offerors. AR Tabs 123c1–c2. Those discussions closed on July 1, 2022, and all three offerors submitted their fourth (and final) set of FPRs by July 11, 2022. AR Tab 148 at 20827–28.

## IV.    Evaluation of Fourth Round of FPRs

NGA conducted a price realism analysis on the labor rates and Service Catalog prices proposed in the fourth round of FPRs across all eight years of the base ordering period. AR Tab 147c at 20812–14, 20818–19. The PET described its methodology as follows:

> First, the PET used statistical analysis to determine the median price across each labor category rate, using each of the Offeror's proposed rates for each labor category rate. Once the median rate was established, a 20% variation was calculated (i.e.[,] median rate minus 20%) to determine the range for realism. This percentage off the median was applied to account for the variations in offerings (such as how indirect accounting burdens are applied, Offeror size, subcontractor burdens, etc.) while still minimizing the risk to NGA in underpaying for any particular labor rate.

Id. at 20813.

Under the methodology the PET employed, "[a]ny labor rate that was under the median rate minus 20% was determined to be unrealistic." Id. If a labor category with five or more of a "labor mix" was found unrealistic, the PET would notify the TMET, which would "determine the impact, if any, to the [technical/management] evaluation rating." Id.

Applying this methodology, the PET conducted a price realism analysis on both the labor rates and Service Catalog prices in the offerors' fourth FPRs. Upon review, the PET found all of TekSynap's labor rates realistic because none exceeded the 20% threshold. Id. at 20814. The PET also determined that TekSynap's Service Catalog prices, "on the whole," were within the realistic range. Id. at 20819. On the other hand, the PET determined that CARS's rates for thirty-one labor categories (i.e., 12.92%) went above the 20% range and were therefore unrealistic. AR Tab 145c at 20661. It concluded that CARS's Service Catalog prices were realistic, "as less than 20% were over the established parameters." Id. at 20666.

Under the Source Selection Plan, the PET was to coordinate with the TMET "to ensure consistency between the proposed prices and other portions of the proposal." AR Tab 12 at 572. However, the TMET was to have "no access to cost/price data." Id. at 571; see also id. at 572 (PET is not to reveal prices to the TMET). In other words, the TMET would be advised which labor category mixes had been assigned unrealistic rates but would not be told what those rates were.

The ratings the Source Selection Evaluation Board assigned with respect to the fourth round of FPRs and their total evaluated prices were as follows:

| FINAL EVALUATION RATING | CARS | TEKSYNAP | |
|---|---|---|---|
| Factor 1: Technical/ Management | Good | Good | Good |
| Subfactor 1.1: Management Plan | **Good**<br>2 Significant Strengths (+++)<br>7 Moderate Strengths (++)<br>5 Slight Strengths (+)<br>6 Meets the Standard (0)<br>1 Slight Weakness (-) | **Good**<br>6 Moderate Strengths (++)<br>6 Slight Strengths (+)<br>9 Meets the Standard (0) | **Good**<br>3 Significant Strengths (+++)<br>6 Moderate Strengths (++)<br>2 Slight Strengths (+)<br>9 Meets the Standard (0) |
| Subfactor 1.2: Technical Approach | **Good**<br>1 Significant Strength (+++)<br>3 Moderate Strengths (++)<br>6 Slight Strengths (+)<br>6 Meets the Standard (0)<br>1 Slight Weakness (-) | **Acceptable**<br>4 Slight Strengths (+)<br>13 Meets the Standard (0) | **Good**<br>2 Moderate Strengths (++)<br>7 Slight Strengths (+)<br>13 Meets the Standard (0) |
| Subfactor 1.3: Transition Plan | **Good**<br>2 Moderate Strengths (++)<br>1 Meets the Standard (0) | **Good**<br>2 Significant Strengths (+++)<br>1 Slight Strength (+)<br>1 Meets the Standard (0) | **Good**<br>3 Slight Strengths (+) |
| Factor 2: Past Performance | Substantial Confidence | Substantial Confidence | Substantial Confidence |
| Factor 3: Security | Pass | Pass | Pass |
| Factor 4: Price (TEP) | $152,993,456.69 | $154,777,361.99 | $148,094,635.00 |

AR Tab 150 at 20917.

## V.     Contract Award

On September 15, 2022, the Source Selection Authority ("SSA") issued a decision directing that CARS be awarded the EMS contract. The SSA compared the offerors' proposals. He noted, as the table above reflects, that while both CARS and TekSynap had been rated "good" under the technical/management factor, "CARS's proposal provide[d] multiple substantive advantages" under the management plan subfactor and four components of the technical approach subfactor. Id. at 20920. These advantages, he found, "far outweigh[ed] TekSynap's advantages" under one component of the technical approach subfactor and the transition plan subfactor, which the Agency described as "the least important Technical/Management Subfactor." Id. at 20922. "When trading off the non-price factors, which are significantly more important than price," the SSA explained, CARS's proposal provided "multiple substantive advantages" that provide "a better value than TekSynap's higher price proposal." Id.

The SSA also found that while both TekSynap and the third offeror were rated "Good" for the technical/management factor, the third offeror's proposal "provide[d] multiple substantive advantages to the Government" under that factor. Id. at 20923. The third offeror's proposal, the SSA observed, "is a better value than TekSynap's higher price proposal." Id. at 20924.

In short, the SSA concluded, CARS's proposal "represents the overall best value and is most advantageous to the Government based on its Technical/Management proposal[,] and it warrants a 3% premium over the lowest price proposal." Id.

## VI.    This Action

TekSynap filed a protest of NGA's award decision with GAO on September 28, 2022. AR Tab 158. NGA issued a stop-work order the next day (one day before the anticipated start date for the contract). AR Tab 151 (notice of award giving anticipated start date of September 30); AR Tab 156 at 21272 (September 29, 2022 stop-work order).

In its protest, among other things, TekSynap challenged NGA's evaluation of the technical/management factor, AR Tab 158 at 21306–15, and the Agency's price realism analysis, id. at 21300–06. On January 5, 2023, GAO rejected TekSynap's arguments, finding no basis for sustaining its protest. AR Tab 171 at 28558.

Five days later, on January 10, 2023, TekSynap filed the complaint that is currently before this Court. ECF No. 1. In that complaint, it requests that the Court declare NGA's proposal evaluations and award decisions arbitrary and capricious, direct NGA to perform a new price realism evaluation and make a new award decision, and permanently enjoin the Agency and CARS from performing work under the contract awarded to CARS in 2022. Id. at 25.

Some six weeks later, on February 24, 2023, TekSynap filed an amended complaint, along with its motion for judgment on the administrative record. Am. Compl., ECF No. 26; see also Pl.'s MJAR. In that complaint, TekSynap added a new claim: that CARS included material misrepresentations in its proposal and that, in light of the misrepresentations, the contract award should be set aside. Am. Compl. ¶¶ 38–48, 78–81. Specifically, TekSynap alleged that notwithstanding the Letter of Commitment that CARS's president, Torie Williams, signed, he intended to continue to serve as CARS's president and would not assume the role of program manager (one of three key personnel on the EMS contract) on a full-time basis as he represented. Id. ¶ 41. It further claims that the resume CARS submitted for Mr. Williams misrepresented his position at CARS, identifying him as "Proposal Manager" rather than president of both CARS and NJVC, another Chenega company. Id. Given Mr. Williams's duties in those positions, TekSynap alleged in its amended complaint, it would be "infeasible" for him to perform them "while serving full-time as program manager on the EMS contract for 24-months." Id. ¶ 42.

On March 8, 2023, TekSynap filed a motion to supplement the administrative record with a declaration from Mr. James Roller, who was then serving as program manager on the incumbent EMS contract. Pl.'s First Mot. to Suppl., ECF No. 30. In the declaration, Mr. Roller stated that shortly after GAO denied TekSynap's protest, on January 20, 2023, Mr. Williams asked him during a phone call if he would serve as CARS's program manager. Roller Decl. ¶¶ 4–5, ECF No. 30-1.

Along with its motion to supplement, TekSynap also requested leave to conduct limited discovery. It claimed that supplementation and discovery were necessary for effective judicial review of its misrepresentation claim. Pl.'s First Mot. to Suppl. at 4–8.

The Court held oral argument on April 10 and granted-in-part and denied-in-part TekSynap's motions. ECF No. 54. It allowed TekSynap to depose Mr. Roller and Mr. Williams concerning the purported phone call that occurred between them. In addition, it ruled that both Mr. Williams and Mr. John Campagna (his supervisor) could be deposed concerning what steps,

if any, CARS took to transition Mr. Williams away from his positions and responsibilities at CARS during the two post-award, pre-protest transition periods. It also allowed TekSynap to supplement the record with the declarations of all three individuals, as well as with the declaration of Derwood Spencer, a colleague of Mr. Roller. Id.

Thereafter, TekSynap filed a third motion to supplement the administrative record with the transcripts of the depositions, ECF No. 68, and a supplemental brief to address its material misrepresentation claim, ECF No. 69. The government and CARS then submitted their replies to TekSynap's MJAR and supplemental briefing. See Int.'s Reply, ECF No. 75; Def.'s Reply, ECF No. 78.

Briefing on the cross-motions for judgment on the administrative record concluded in May. Oral argument was held on TekSynap's third motion to supplement and the cross-MJARs on July 11, 2023. See ECF No. 83.

## DISCUSSION

## I.    TekSynap's Third Motion to Supplement the Administrative Record

The Federal Circuit has made clear that the "focal point" of the Court's review of an agency's procurement decision "should be the administrative record already in existence, not some new record initially made in the reviewing court." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). "[L]imiting review to the record actually before the agency" helps courts guard against "using new evidence to convert" the arbitrary and capricious standard applicable to bid protest actions "into effectively de novo review." Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (Fed. Cl. 2000)). Accordingly, a court should not allow supplementation of the administrative record unless "the omission of extra-record evidence precludes effective judicial review" of the agency's decision. Id. (quoting Murakami, 46 Fed. Cl. at 735).

In this case, TekSynap raised a material misrepresentation claim. As this Court observed when it granted an earlier motion to supplement the record and to depose certain witnesses, "[t]he two essential elements of a material misrepresentation claim are a false statement by the awardee and agency reliance on the false statement in its selection decision." TekSynap Corp. v. United States, No. 23-36, 2023 WL 3302841, at *3 (Fed. Cl. May 8, 2023) (citing Connected Global Solutions, LLC v. United States, 159 Fed. Cl. 801, 805 (2022); Golden IT, LLC v. United States, 157 Fed. Cl. 680, 688 (2022); NetCentrics Corp. v. United States, 145 Fed. Cl. 158, 169 (2019); Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006)). And as the Court also noted at that time, "[i]t is unlikely (at best) that an administrative record will ever include the evidence a court would need to determine whether a statement made in a successful proposal was false." Id. (citing Golden IT, LLC, 157 Fed. Cl. at 688).

When the Court granted TekSynap permission to take limited depositions of Messrs. Williams, Campagna, and Roller, it did so because it concluded that it could not effectively review TekSynap's misrepresentation claim without their testimony. That conclusion still stands. Therefore, TekSynap's motion to supplement the administrative record with the deposition transcripts will be granted.

## II.      Material Misrepresentation Claim

As noted, a material misrepresentation claim in the procurement context requires a plaintiff to prove a false statement by the awardee and agency reliance on that false statement in selecting the awardee's proposal for the contract. In evaluating these claims, courts "look only to whether or not the statement itself constitutes misrepresentation—something that is determinable the moment that it is submitted for agency consideration—and then whether or not the agency relied on that statement in making its award decision." GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 484 (2012).

TekSynap alleges that CARS's proposal included two misrepresentations that the Agency relied upon when it assigned CARS's proposal a slight and a moderate strength under the technical/management factor. Both alleged misrepresentations, as noted, concerned Mr. Torie Williams, whom CARS designated to serve as program manager if it were awarded the EMS contract.

The first misrepresentation, according to TekSynap, is that Mr. Williams's resume listed "Proposal Manager" as his "Position Title." Pl.'s Suppl. Br. at 13 (citing AR Tab 134.4 at 17374). The second misrepresentation concerns whether Mr. Williams's Letter of Commitment falsely represented his intent to serve as program manager on a full-time basis for a two-year period. Id. at 4.

For the reasons set forth below, the Court concludes that the record, as supplemented by the additional declarations and deposition transcripts, does not support TekSynap's material misrepresentation claims.

### A.      Inaccurate Identification of "Position Title" in Resume

As noted above, offerors were required to submit resumes for their proposed key personnel that the Agency would use to determine "the extent to which the offeror demonstrates they have the qualifications to perform in the role in accordance with [the] requirements in [the] IDIQ [Performance Work Statement]." AR Tab 120.1 at 16861. The RFP required that the resumes be no longer than two pages and that they include specified information in an order that the RFP prescribed. Id. at 16847. The required information included the candidate's educational background, security clearance status, relationship to the offeror, relevant employment experience, and "[d]etailed descriptions demonstrating how the individual possesses the mandatory and desired qualifications for the key personnel role." Id. In addition, the RFP required resumes to bear both the candidate's name and a "Position Title," which it identified as the candidate's "Proposed Key Personnel Role." Id.

CARS specified that Torie Williams would be its program manager for the EMS contract. AR Tab 134.4 at 17374. Mr. Williams was and still is the president of CARS. See Williams Dep. at 6:17–7:4, ECF No. 68-1. As president, Mr. Williams is responsible for business growth, corporate strategy, and providing "support [to] a customer's mission." Id. at 7:7–13.

The resume CARS submitted for Mr. Williams identifies his "Position Title," i.e., his "Proposed Key Personnel Role," as "Proposal Manager." AR Tab 134.4 at 17374. "Proposal Manager" was not one of the key personnel positions specified in the RFP and was not the

position that Mr. Williams was identified to fill. The correct "Position Title" based on Mr. Williams's proposed key personnel role was "Program Manager." According to TekSynap, CARS included an inaccurate position title to "intentionally obscur[e] from the Agency [Mr. Williams's] true position title as President of CARS." Pl.'s Suppl. Br. at 13 (citing AR Tab 134.4 at 17374). It did so, according to TekSynap, because it would have been "infeasible" for Mr. Williams to perform his duties as CARS president while serving for twenty-four months as program manager on the EMS contract. Pl.'s MJAR at 14.

TekSynap's argument is fundamentally flawed. The RFP required that Mr. Williams's resume list his "Proposed Key Personnel Role" (i.e., "Program Manager") as the position title on his resume, not his then-current position (CARS president). TekSynap's argument to the contrary, see Pl.'s Suppl. Br. at 13, is somewhat disingenuous. The FPR that TekSynap itself submitted in the fourth round included a resume for its proposed program manager that listed "Program Manager" as his "Position Title"; it did not name the position he then held ("Senior Operations Manager"). AR Tab 136.3 at 20035. The same is true as to its proposed operations manager, whose "Position Title" was listed as "Operations Manager," and not as his then-current position, "Senior Enterprise Management Engineer." Id. at 20039.

The government and intervenor argue, and the Court agrees, that the insertion of "Proposal Manager" rather than "Program Manager" as Mr. Williams's proposed key personnel role was likely the result of a typographical or clerical error. The related portions of CARS's proposal list Mr. Williams as the proposed program manager, and it is clear that is the position the Agency understood he would hold. See, e.g., AR Tab 134.3 at 17320, 17328; AR Tab 134.4 at 17359–60.

Further, other portions of the record make it obvious that CARS was not trying to hide the fact that Mr. Williams was then serving as its president. See, e.g., AR Tab 109.1.1 (CARS cover letter for FPR 3 signed by "Torie Williams[,] President, CARS"); AR Tab 109.2 at 14182 (another cover letter for FPR 3 stating that, "[a]s the President of CARS, Mr. Williams is authorized to legally bind the offeror"); AR Tab 134.2 at 17297 (CARS cover letter for FPR 4). CARS's claim that Mr. Williams's resume contained a material misrepresentation is therefore rejected.

## B.   Letter of Commitment

In addition to its argument that Mr. Williams's resume contained a material misrepresentation, TekSynap argues that he misrepresented his intentions in his Letter of Commitment. As noted, the RFP required that the Letters were to "clearly and affirmatively state the named individual's commitment to perform without reservation the duties and responsibilities specified in the offeror's proposal for the key position." AR Tab 120.1 at 16847. The RFP alerted offerors that the Agency would give greater weight to those that provided "[i]ndividual commitments to dedicate time 100% to the EMS contract and commit to more than 12 months of performance from contract award" than to "individuals who commit to only 12 months of performance." Id. at 16861.

In Mr. Williams's Letter of Commitment, he stated that he would "be available to the NGA EMS program for a minimum of 24 months," starting on the first day of contract

performance. AR Tab. 134.4 at 17380 (Williams Letter of Commitment). He also stated that he "clearly and affirmatively commit[ted] to perform without reservation the duties and responsibilities specified for the Program Manager position." Id. Finally, he included a promise that he would "not divide [his] time with other contracts throughout the entire period of performance," and that he would instead "fully" dedicate his time to the contract, if awarded to CARS. Id.

TekSynap argues that "Mr. Williams's stated commitment to dedicate himself fully to the EMS contract and not divide his time was a material misrepresentation." Pl.'s Suppl. Br. at 4. Specifically, it contends that the discovery it conducted revealed evidence "that CARS did not seriously intend to have Mr. Williams step down from [his] position as President" so that he could fulfill his commitment to work on the EMS contract exclusively. Id.

This assertion is not supported by the record. To the contrary, the record shows that CARS in fact did (and presumably still does) expect that once the contract award is finalized (i.e., after TekSynap's protest is resolved), Mr. Williams will formally give up the position of president and a replacement will be installed. Requiring that he have already done so, notwithstanding that the two contract awards to CARS have been on almost complete hold since November 2020, is just unreasonable.

Thus, John Campagna, who is president of Chenega's Military, Intelligence, and Operations Support Strategic Business Unit, and Mr. Williams's direct supervisor, testified that it had always been his understanding that Mr. Williams "would resign [from] all other positions within the Chenega organization prior to the commencement of [the] contract." Campagna Decl. ¶¶ 1–2, 4, ECF No. 34-1. He explained that at the time CARS designated Mr. Williams as the proposed program manager, he saw "no need to reassign [Mr. Williams's] positions . . . and have him sit idly by while waiting for a possible contract award and commencement of performance." Campagna Decl. ¶ 6.

TekSynap contends that the statement that Mr. Williams would resign from his position as president once contract performance began is contradicted by actual events. It argues that Mr. Williams allegedly "did nothing to officially step down from his role as President of CARS and no individual replaced him in that role" during the transition periods that followed the two contract awards made to CARS. Pl.'s Suppl. Br. at 5.

The Court notes, however, that beginning on December 1, 2020, the day that NGA issued Task Order 1 to CARS after the first contract award, Mr. Williams's timesheets show that he began charging all of his time to the EMS contract. Williams Dep. at 25:15–21, 36:2–8, 48:7–16; Williams Dep. Ex. 1, at 33, ECF No. 68-1. To be sure, he did not formally step down as CARS president at that time. But as Mr. Williams testified, it was not necessary for him to then do so to fulfill his commitment to devote all of his time to the EMS contract. Williams Dep. at 25:8–21. Mr. Williams explained that he had "staff in place that w[ere] able to manage the personnel, the four or five people that we had at the time." Id. at 25:19–21; see also Campagna Dep. at 30:17–18 ("CARS was a small company" with only four employees.), ECF No. 68-3; Williams Dep. at 25:9–13 (explaining that in December 2020, "CARS was a new company" with "a total of four people"); Campagna Dep. at 30:13–15 (selecting Mr. Williams's successor "was less important to [him] than actually getting [the EMS contract] started").

The fact that Mr. Williams continued to serve as CARS president in September 2022 after the second contract award similarly does not bear on whether it was his intent to resign from the position once contract performance began. The start date for Task Order 1 was September 30, 2022, AR Tab 151, but NGA issued a stop work order on September 29, 2022, before performance began, AR Tab 156 at 21272. And the stay of performance has since been kept in effect in the wake of the second GAO protest and the present one before this Court, as NGA continues to obtain services from the incumbent, ManTech. Def.'s MJAR Ex. 1, ECF No. 37-1.

TekSynap also notes that in October 2022, the month after CARS was awarded the EMS contract for the second time, Mr. Williams took on an additional role as general manager of NJVC, another division of CARS. Pl.'s Suppl. Br. at 12. According to Mr. Williams, his job was to "fold[]" and "collapse" NJVC into CARS. Williams Dep. at 42:5–43:1. This primarily involved "integrating . . . the NJVC personnel and leadership team over to CARS." Id. at 45:12–14. The Court sees no inconsistency between the commitments contained in Mr. Williams's Letter and him performing these additional duties as it remained unclear when CARS would begin performance on the EMS contract, if ever.

TekSynap also makes much of the fact that CARS's succession plan required that a successor for Mr. Williams be named as soon as he stepped down from his job as CARS president. And yet, TekSynap points out, no successor was named for him after CARS received the two contract awards. According to TekSynap, this shows that the plan was for Mr. Williams to remain on as CARS president, and not to step down as he committed to do in his Letter. Pl.'s Suppl. Br. at 5–10.

Again, this argument is unpersuasive. Until it is confirmed that CARS will eventually begin performance on the contract, it is not unreasonable for it to not make any changes to the titles or roles of its personnel. The fact that CARS did not identify a new president as the award continued to be subject to protest does not reflect that when it proposed Mr. Williams as program manager, it did not intend to replace him as president.

Finally, TekSynap also contends that Mr. Williams's lack of commitment to serve as program manager on a full-time basis for twenty-four months is reflected in the remarks he allegedly made to James Roller, the EMS program manager for the incumbent contractor, ManTech, during a January 20, 2023 telephone call. Pl.'s Suppl. Br. at 10–11. This contention is similarly unpersuasive.

The call at issue took place several weeks after GAO rejected TekSynap's second protest. In a declaration submitted with TekSynap's motion to supplement the administrative record, ECF No. 30, Mr. Roller stated that during the call "Mr. Williams asked if [he] wanted to serve as CARS'[s] Program Manager for the EMS [contract]," but that he "declined the opportunity," Roller Decl. ¶ 5.

CARS submitted a declaration from Mr. Williams in response to Mr. Roller's declaration. In it, Mr. Williams "categorically den[ied]" ever asking anyone to serve as CARS's program manager for the contract, "whether on January 20, 2023 or at any other time." Williams Decl. ¶ 7, ECF No. 38.

Given the direct conflict between Mr. Roller's assertion and Mr. Williams's categorical denial, the Court allowed TekSynap to conduct limited discovery. The discovery, as noted above, included depositions of Mr. Roller and Mr. Williams regarding the substance of the disputed phone conversation. The Court cautioned at the time that while potentially relevant to the bona fides of Mr. Williams's Letter of Commitment, even if Mr. Williams had offered Mr. Roller the program manager job this past January, that would not be "sufficient by itself to prove that—at the time CARS submitted its final proposal the preceding July—the pledges contained in Mr. Williams' Letter of Commitment were not genuine ones." TekSynap Corp., 2023 WL 3302841, at *4.

Mr. Williams and Mr. Roller have since both been deposed about the call. Mr. Roller still maintains, and Mr. Williams continues to categorically deny, that Mr. Williams asked Mr. Roller if he was interested in the program manager position. Williams Dep. at 21:6–11, 47:11–18; Roller Dep. at 11:7–10, ECF No. 68-2. Yet both agree that Mr. Williams did not actually offer him a job during the call. Nor did Mr. Williams apparently initiate the call with the purpose of making such an offer.

Instead, the depositions show that the purpose of the call was to float the possibility that ManTech would agree to fill existing vacancies on the incumbent contract with employees of CARS or NJVC while the present bid protest was pending. Mr. Williams characterized his phone call as a "cold call" to make this "pitch" to ManTech. Williams Dep. 22:18–20.

Mr. Roller agreed that the call was largely devoted to this subject. If the subject of the program manager position came up at all, as Mr. Roller contends, it was raised at the end of the call when, according to Mr. Roller, the conversation "kind of concluded" with Mr. Williams asking him if he "had any interest in performing the Program Manager's role." Roller Dep. at 11:7–10.

At his deposition, Mr. Roller stated that the subject came up again several weeks later when he was conversing with Mr. Williams at a social event that they both attended at "Molly's," a bar. On this occasion, Mr. Roller testified, Mr. Williams "kind of asked" him if he was "certain" that he was not interested in the job. Id. at 14:3–11.

Mr. Roller acknowledged at his deposition, however, that "just to be clear," he did not intend to say that Mr. Williams offered him the job or extended what Mr. Roller called "a formal job offer" during these exchanges. Roller Dep. at 23:24–24:6. Instead, Mr. Roller testified, he "was just asked if [he] had interest." Id. at 23:25–24:1. He also stated that it was inaccurate to state that Mr. Williams was "recruiting" him for the job. Id. at 54:9–21. According to Mr. Roller, he "classified it as a simple question that was simply answered and then no further discussion." Id. at 54:21–23.

Assuming this is the case (and notwithstanding Mr. Williams's denial that the subject came up at all), it is difficult to see how these remarks made in January and February 2023 bear on whether, in July 2022, Mr. Williams intended to fulfill his commitment to serve as program manager. At most, assuming the subject came up, Mr. Williams was asking a hypothetical question about whether, if CARS offered Mr. Roller the job, Mr. Roller would have "an interest"

in it. No job offer was made. Mr. Roller did not consider himself to have been "recruited" for the position.

And, of course, the fact that in January 2023 Mr. Williams might have been entertaining the possibility of filling the position with someone other than himself does not show that some six months earlier, when he signed his Letter of Commitment, he was misrepresenting his intentions. Indeed, Mr. Williams has since testified that he still intends to fulfill his commitment, assuming that the award to CARS stands. Williams Dep. at 26:3–5.

In short, TekSynap has failed to establish that Mr. Williams's resume or Letter of Commitment contained false statements regarding his intent to serve as program manager for CARS on the EMS contract. Its material misrepresentation claim therefore fails.

## III.   Price Realism

Under FAR 15.402(a), agencies are required to evaluate price proposals to determine whether they are "fair and reasonable," i.e., whether the prices the offeror proposes to charge for its services are too high. DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1305, 1310 (Fed. Cir. 2021) (citing Agile Def., Inc. v. United States, 959 F.3d 1379, 1384 (Fed. Cir. 2020)). The purpose of a price realism analysis, on the other hand, is to determine whether the prices an offeror proposes are too low. Id. at 1305.

The FAR does not require agencies to conduct price realism analyses. In fact, for fixed-price contracts, "a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk of loss on the contractor." KSC Boss All., LLC v. United States, 142 Fed. Cl. 368, 392 (2019) (quoting NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015)). Nonetheless, even in a fixed price context, an agency may choose to do a price realism analysis because unrealistically low prices may "reflect[] a lack of understanding of the solicitation's requirements," thus increasing the risk of poor performance." See AGMA Sec. Serv., Inc. v. United States, 158 Fed. Cl. 611, 626 (2022) (citing KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 356 (2015); CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 378–79 (2010)); see also AR Tab 120.1 at 16867 (RFP stating that "[p]rice realism analysis may be applied in order to assess the risk of performance due to unrealistically low prices" and "to assess whether an offeror's unrealistically low labor rates reflect a lack of technical understanding or risk.").

The Solicitation in this case stated that NGA "may" conduct a price realism analysis at its discretion. AR Tab 120.1 at 16853. It further provided that—should a price realism analysis be conducted—the Agency would examine either the offeror's proposed fully burdened labor rates, its Service Catalog Price List, and/or the Task Order 1 price proposal. Id. at 16867.

The RFP did not prescribe the methodology the Agency would use to conduct its price realism analysis. The NGA therefore possessed "broad discretion" to determine how and in what depth it would proceed. Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 545–46 (2013) (quoting Ne. Mil. Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011)); see also Agile Def., Inc., 959 F.3d at 1385–86 (endorsing decisions of the Court of Federal Claims holding that "contracting agencies enjoy wide latitude in conducting the cost realism analysis"); KWR Constr., 124 Fed. Cl. at 357 (observing that an agency has discretion to determine "the

nature and extent of a price realism analysis . . . unless the agency commits itself to a particular methodology in a solicitation" (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009))).

As explained above, the NGA conducted price realism analyses on the FBLRs and SCP Lists contained in the fourth round of FPRs. AR Tab 147c at 20812–14, 20818–19, 20822. With respect to the FBLRs, the PET's methodology is set forth in its reports. As described there, the price team first identified the median rate the offerors proposed for each labor category and each labor mix within that category. AR Tab 147c at 20813. The price team then set the price realism cutoff by applying a 20% variation (i.e., subtracting 20% from the median). Id. Rates that were more than 20% lower than the median were deemed unrealistic. If a labor category had five or more labor mixes that were found unrealistic, the PET would notify the TMET, which would "determine the impact, if any," that the unrealistic rates had on the technical/management rating. Id.; see also AR Tab 120.1 at 16867 (Section M.10.4. of the Solicitation, providing that risks identified through price realism analysis will impact the technical and management factor).

TekSynap challenges the methodology the Agency employed in conducting its price realism analysis. First, it takes issue with NGA's decision to use median prices—as opposed to the mean—as well as its use of "a standard deviation of 20% below that median to identify unrealistically low rates." Id. at 18, 22.[3] Further, TekSynap contends that the Agency made an "irrational assumption that the median of offered rates is inherently realistic regardless of the unique performance approaches associated with labor rates." Id. at 18.

TekSynap's challenge to the statistical analysis the PET chose to employ lacks merit. The Court applies a narrow standard of review to an agency's price realism methodology and analyses under the applicable arbitrary and capricious standard. See Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009). The Court will not disturb an agency's methodology or its application, so long as it has a rational basis and is adequately documented. Active Network, LLC v. United States, 130 Fed. Cl. 421, 427 (2017) (citing Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 288 (2013)). Its role is a very modest one: ensuring that the agency "took into account the information available," indulged no "irrational assumptions," and made no "critical miscalculations." Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 539 (2011); see also Afghan Am. Army Servs., 90 Fed. Cl. at 358 ("An agency's price-realism analysis lacks a rational basis if the contracting agency made 'irrational assumptions or critical miscalculations.'" (quoting OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000))).

TekSynap's challenge to the PET's methodology does not demonstrate that the Agency failed to take account of relevant information, relied on irrational assumptions, or made critical

---

[3] As the government points out, TekSynap's characterization of the statistical tool the PET employed is inaccurate. See Def.'s MJAR at 34 n.7. NGA used the "Range of Coefficient" statistical tool when it conducted its price realism analysis, not a standard deviation approach. Id. The PET explained that it selected this tool "because range is the simplest measure of dispersion" and because "[t]he Range of Coefficient is the analogous relative measure of dispersion." AR Tab 147c at 20811.

miscalculations. The decision whether to use median or mean rates when setting its thresholds for price realism is one that is left to the agency's discretion. Both the median and mean are ways to measure a data set's central tendency, i.e., "the single score that is most typical or most representative of the entire group." Frederick J. Gravetter & Larry B. Wallnau, Statistics for the Behavioral Sciences 73 (9th ed. 2013). And while TekSynap argues that using the median can potentially lead to skewed results in small data sets, it does not show that such skewing occurred here. Pl.'s MJAR at 22. Further, as the government points out, "[t]he median of a set of numbers [can be] less impacted by outlier numbers . . . than the mean," and the Agency was tasked to measure labor rates "with a wide dispersion." Def.'s MJAR at 37. It was not irrational, therefore, for the price team to base its analysis on the median rates.

Moreover, the PET's choice of 20% as the figure it would use to set the price realism range was rational and fully documented. As the PET explained, it used that figure "to account for the variations in offerings (such as how indirect accounting burdens are applied, Offeror size, subcontractor burdens, etc.) while still minimizing the risk to NGA in underpaying for any particular labor rate." AR Tab 147c at 20813. It noted that "[t]he percentage was based on historical competitive procurements at NGA, and the percentage that has been considered acceptable on those historical efforts." Id.

TekSynap also challenges the Agency's price realism methodology on the grounds that the Agency failed to conduct an assessment of the offerors' prices in light of each offeror's technical approach. Pl.'s MJAR at 23. It asserts that because of the "mechanical[] calculat[ion]" the Agency allegedly employed, "[n]o step in the Agency's methodology considered whether an offeror is proposing to hire an incumbent employee, an employee from their staff, an employee on the open market, or Elon Musk." Id. at 20.

TekSynap's assertions are misguided for several reasons. For one thing, TekSynap's premise—that an offeror's unique technical approach informs the amounts it sets for its fully burdened labor rates—is incorrect. The RFP required that labor rates be based on generic labor categories (e.g., systems engineer, technical writer, etc.) and a set of fixed criteria (skill level, location, site type, and clearance required). It was these objective factors—and not any particular approach on the part of an offeror regarding which specific individuals it would hire—that offerors were to use to determine labor rates. AR Tabs 13b5–b6.

Second, there is no merit to TekSynap's challenge to the Agency's method of determining whether unrealistically low prices posed performance risks. As noted, if the requisite percentage of labor rates was deemed unrealistic, then the PET would send a list of the labor category mixes at issue to the TMET. See, e.g., AR Tab 78. The TMET was then tasked with evaluating whether and to what extent unrealistically low rates paid for the labor mixes identified could affect an offeror's ability to perform on the contract.

Despite the fact that the TMET was charged with conducting this review, TekSynap contends that it lacked the capacity to perform its assigned task. Specifically, it argues that it was "impossible for the technical team to determine whether there was performance risk associated

with the labor rates" because the TMET was walled off from information about the amount of the proposed rates that the PET found unrealistic. Pl.'s MJAR at 21.

This assertion is belied by the record. For example, the PET determined that CARS's fourth FPR proposed labor rates in thirty-one labor categories that were unrealistically low. AR Tab 145c at 20661. It referred the low labor rate categories to the TMET for a performance risk analysis in accordance with the evaluation criteria. Id. Consistent with the Source Selection Plan, the TMET was not afforded access to the actual labor rates proposed. It nonetheless was able to provide an assessment of how the unrealistic rates might interfere with CARS's ability to attract qualified staff consistent with its staffing plan. It noted that all thirty-one labor category mixes the PET referred were for off-site work, and that none of them were proposed for the staffing of Task Order 1. It further observed that the majority of the work to be performed on the EMS contract was expected to be performed on site. And it acknowledged that there remained a risk to CARS's ability to staff future task orders, which might require off-site staff, but it judged that risk to be a "slight" one. AR Tab 145a at 20612.

Similarly, NGA's price evaluation team "identified six labor category mixes . . . that had price concerns in [the third offeror's] proposal." AR Tab 146a at 20681. The TMET then "assessed the risk of the . . . unrealistically low labor rates to [the third offeror's] Staffing Plan under Subfactor 1.1." Id.; see also AR Tab 146c at 20733 (finding less than 7% of the third offeror's labor rates unrealistically low); AR Tab 147a at 20757 (TMET assessed risk to TekSynap staffing plan arising out of price realism concerns for seventeen labor category mixes in TekSynap's FPR 2).

TekSynap further contends that the Agency inexplicably deviated from Department of Defense ("DoD") policy when it precluded the TMET from having access to the actual labor rates that the PET found unrealistic. Pl.'s Reply at 6–9, ECF No. 43. The DoD Source Selection Procedures, however, do not say anything one way or the other about whether technical evaluators should be provided with cost or price information. DoD, Source Selection Procedures: Defense Federal Acquisition Regulation Procedures, Guidance, and Information Subpart 215.3—Source Selection (Mar. 31, 2016). Therefore, they neither authorized nor prohibited the procedures that NGA decided to use; nor do DoD's procedures suggest that NGA acted outside of its considerable discretion when it decided not to provide technical evaluators with pricing information.

Teksynap cites CRAssociates, Inc., v. United States, 95 Fed. Cl. 357, 374 (2010) to support its argument that it was irrational for the Agency to not provide the technical evaluators with information. Pl.'s Reply at 7. But CRAssociates involved an agency's compliance with the FAR's professional services clause, 48 C.F.R. § 52.222–46, and not the adequacy of its price realism analysis. That clause requires agencies to evaluate the total compensation plan offerors propose for the professional employees who will work under the contract to "assure that it reflects a sound management approach and understanding of the contract requirements." CRAssociates, Inc., 95 Fed. Cl. at 369 (quoting 48 C.F.R. § 52.222–46(a)). It further provides that "'[t]his evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work,' as well as the plan's 'impact upon recruiting and retention, its realism, and its consistency with the total plan for compensation.'" Id. (quoting 48 C.F.R. § 52.222–46(a)). And most significantly for purposes of this case, the clause states that

"proposals envisioning compensation levels lower than those of predecessor contractors for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." 48 C.F.R. § 52.222–46(b).

As the court found in CRAssociates, to conduct the analysis required by the professional services clause, the agency must be able to compare the compensation levels on the incumbent contract to those the offeror proposed to determine whether further evaluation is required. CRAssociates, 95 Fed. Cl. at 371. But the Source Selection Evaluation Board in CRAssociates, "which was charged with evaluating the technical proposals, could not have considered the impact of [the successful offeror's] lower compensation on its ability to maintain program continuity and uninterrupted work, as well as the availability of required competent professionals, as it was walled off from any labor cost information and thus did not know how [the awardee's] compensation compared to that offered by [the protestor]." Id. at 374.

It is clear that the court's concern about access to incumbent rates was based on the particular requirements of the professional services clause and did not reflect a view that walling off the technical team from pricing information renders a price realism analysis irrational. Indeed, the court in CRAssociates stated that "with the exception of the agency's handling of professional compensation . . . the Army's price realism analysis was consistent with the evaluation criteria set forth in the RFP and not otherwise arbitrary and capricious." Id. at 381. TekSynap's reliance on CRAssociates is therefore misplaced.

The Court also finds unpersuasive TekSynap's argument that—even assuming the validity of its methodology—the Agency failed to consider the risk that the unrealistically low rates CARS and the third offeror proposed would prevent them from meeting their incumbent capture goals. Pl.'s MJAR at 24. According to TekSynap, some of the rates CARS and the third offeror proposed were as much as $20 to $40 an hour lower than what employees currently make on the incumbent contract. Id. The Agency, according to TekSynap, irrationally ignored the risks these differentials posed to the offerors' ability to deliver on their incumbent capture goals. Id. This was especially prejudicial, TekSynap argues, given that the Agency assigned two moderate strengths to CARS's proposal based on its approach to incumbent capture. Pl.'s Reply at 16 (citing AR Tab 145a at 20608).

But the PET did not have access to the salaries and fringe benefits the incumbent contractor or its subcontractors were paying their employees.[4] What the Agency had instead were the fully burdened labor rates that the offerors proposed to pay. In addition, the fully

---

[4] The Court recognizes that TekSynap was a subcontractor on the incumbent contract and had access to the salaries and fringe benefits that it was providing its own employees. The record reflects that TekSynap had thirteen full-time employees on the contract. AR Tab 147a at 20758. But its proposal did not state that the labor rates it proposed were based on their salaries and fringe benefits. It stated that the proposed labor rates were based on the salaries it paid employees performing similar work, compensation surveys from industry sources, and information derived from the Economic Research Institute Salary Assessor. AR Tab 136.9 at 20313.

burdened labor rates reflect not just salaries but "all cost and profit." Def.'s Reply at 14 n.11 (citing AR Tab 13b6 at 840). Therefore, the PET did not compare offerors' proposed rates to the salaries and fringe benefits paid to incumbent employees. It compared the proposed rates to one another, as it was in its discretion to do.

TekSynap's remaining price realism argument is that the Agency did not properly apply its price realism methodology when reviewing the third offeror's Service Catalog prices. Pl.'s MJAR at 32–35. It notes that for FPR 4, the PET found eight SCIDs that the third offeror proposed under CLIN 0002 unrealistically low. Id. at 32 (citing AR Tab 146c at 20738–39). According to TekSynap, the PET should have, but did not, evaluate whether the unrealistically low SCIDs exceeded the Agency's unrealistic rate allowance of 20%. Id. at 34. Had it done so, TekSynap argues, it would have found the allowance exceeded for CLIN 0002 and would have had to evaluate the performance risk posed by the unrealistically low prices. Id. at 35.

This allegation is based on a misstatement of the Agency's price realism methodology. NGA treated all SCID unit prices as realistic unless the total number of unrealistic SCIDs exceeded 20%. See, e.g., AR Tab 146c at 20741 (determining if SCIDs "on the whole" were realistic). It did not apply the 20% threshold on a CLIN-by-CLIN basis, as TekSynap asserts.

Under a proper application of the PET's methodology, the third offeror did not exceed the 20% threshold for identifying its SCID unit prices as unrealistic. There were 2,112 SCID unit prices (264 SCIDs times eight years). Id. For FPR 4, the PET determined that the third offeror's proposal had a total of eighty SCIDs with unrealistic unit prices. Id. The SCIDs with unrealistic unit prices thus amounted to 3.7979% of the total number of SCIDs, which was well below NGA's 20% allowance. Id. TekSynap's argument that the Agency did not properly apply its methodology when it failed to determine the performance risks posed by the eighty unrealistically low SCIDs lacks merit.[5]

In short, TekSynap has not met the high threshold required to show that NGA's choice of price realism methodology or its application reflected arbitrary and capricious decision making

---

[5] In its supplemental brief, TekSynap contends that the government and the intervenor have waived their rights to respond to this argument by failing to address it in their initial briefs and waiting until their replies to do so. Pl.'s Suppl. Br. at 14 n.2. One might just as easily argue that TekSynap should not be permitted to pursue the claim because it did not identify this alleged error in its amended complaint. But in any event, it is TekSynap's burden to prove its claim that the Agency failed to follow its methodology for determining the realism of the third offeror's SCIDs. The Court declines to grant conclusive effect to assertions in TekSynap's motion for judgment on the administrative record that misstate what that methodology was and that are otherwise unsupported by the record.

on the part of the Agency. Its challenge to the award decision based on price realism is therefore rejected.

## IV.  Discussions Between TekSynap and NGA

TekSynap's final claim is that the discussions it had with NGA were misleading and/or unequal. Pl.'s MJAR at 35. The discussions were misleading, TekSynap argues, because NGA "improperly identif[ied] certain labor rates and Service Catalog prices as too low when a reasonable evaluation would not have identified them as such." Pl.'s MJAR at 37. Further, according to TekSynap, the improper identification of labor rates and Service Catalog prices as unrealistic caused it to raise its prices to its competitive detriment. Id. at 36.

"Discussions are misleading when a procuring agency issues incorrect, confusing[,] or ambiguous communications that misdirect an offeror attempting to revise its proposal." Quality Control Int'l, LLC v. United States, 147 Fed. Cl. 193, 198–99 (2020) (quoting CEdge Software Consultants, LLC v. United States, 117 Fed. Cl. 419, 434–35 (2014)); see also Agile Def., Inc. v. United States, 143 Fed. Cl. 10, 20 (2019). This includes situations in which, during discussions, an agency erroneously communicates to the offeror that there is a weakness in its proposal. Caddell Const. Co. v. United States, 125 Fed. Cl. 30, 46 (2016).

TekSynap's argument that it was misled by NGA's identification of certain labor rates and Service Catalog prices as too low is entirely derivative of TekSynap's claim that the Agency's price realism methodology and analysis was arbitrary and capricious. The Court, however, has found the Agency's price realism analysis and methodology reasonable. It must therefore reject TekSynap's claim that it was misled when the Agency communicated the result of the price realism analysis so that TekSynap might have an opportunity to adjust its proposal.

TekSynap's unequal discussion claim—which appears nowhere in its amended complaint—is similarly without merit. It observes that NGA advised TekSynap that it had been assigned a moderate weakness for FPR 2 where the PET had identified rates in seventeen labor category mixes as unrealistically low. AR Tab 95b – Encl. 1 at 13512–13. On the other hand, during discussions with CARS, the Agency advised the offeror that it had assigned CARS's FPR 2 a slight weakness because the rates for fifty-one of its labor category mixes had been deemed unrealistic. AR Tab 93b – Encl. 1 at 13453–54. TekSynap observes that this "difference in severity of the weakness" (i.e., moderate v. slight) "impacted how the offerors responded." Pl.'s MJAR at 38. CARS stated that it intended to increase only some of its fifty-one low rates, and TekSynap committed to updating all seventeen of its low labor rates. Id. (citing AR Tab 93b – Encl. 1 at 13453–54; AR Tab 102 at 13859; AR Tab 104a – Encl. 1 at 13902, 13936).

Although characterized as a claim based on unequal discussions, this argument is really a challenge to the Agency's decision that TekSynap's seventeen unrealistic labor rates posed a somewhat greater performance risk than the fifty-one unrealistic rates CARS proposed. TekSynap's objection is not to the fact that the Agency told TekSynap that its proposal had been assigned a moderate weakness while it told CARS that it had been assigned only a slight

weakness. Rather, TekSynap is complaining that it was a victim of disparate treatment in the evaluation process itself.

To prevail on this type of disparate treatment claim a protestor must show either "that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020). Only if a protester meets one of these thresholds can the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." Id. at 1373; see also WellPoint Mil. Care Corp. v. United States, 953 F.3d 1373, 1378 (Fed. Cir. 2020).

In this case, TekSynap has made no effort at all to show that the deficiencies in the two proposals were substantively indistinguishable. Nor has it tried to otherwise explain why it was unreasonable for the Agency to find that TekSynap's unrealistic rates posed a greater performance risk than the unrealistic prices identified in CARS's proposal. Its argument appears instead to be based on a comparison of the raw number of labor category mixes for which labor rates were found unrealistic: fifty-one for CARS, but only seventeen for TekSynap.

But the record illustrates the invalidity of such a simplistic comparison. CARS's technical approach required it to use only two of the fifty-one labor categories for which unrealistic rates had been identified. AR Tab 82a at 12984. The Agency therefore assigned only a "slight weakness" to CARS's FPR 2. On the other hand, TekSynap's technical approach depended on using a higher percentage of labor mixes for which it had proposed unrealistic rates. See AR Tab 95b – Encl. 1 at 13512. Its FPR 2 therefore received a moderate weakness.

TekSynap, in short, has not shown disparate treatment or unequal discussions. On that basis, and for the reasons set forth in the rest of this Opinion, its protest lacks merit.

## CONCLUSION

For the reasons stated above, Plaintiff's third motion to supplement the administrative record, ECF No. 68, is **GRANTED**. Plaintiff's motion for judgment on the administrative record, ECF No. 27, is **DENIED**, and the government's cross-motion, ECF No. 37, as well as the intervenor's, ECF No. 35, are **GRANTED**. The Clerk is directed to enter judgment accordingly.

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge